IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CARRIE LEE JOHNSON                                                 PLAINTIFF

     V.                 Civil No. 2:22-cv-02129-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration                              DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Carrie Johnson ("Johnson"), brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying her claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I.     Procedural Background

Johnson protectively filed her applications for DIB and SSI on June 4, 2020[1], alleging disability since April 26, 2018, due to post traumatic stress disorder ("PTSD"), major depressive disorder, degenerative disk disease ("DDD") of the cervical and lumbar spine, chronic pain (neck, back, and extremities), migraines, anxiety, and arthritis. (ECF No. 9, pp. 110, 119, 138, 248-261, 297-298). The Commissioner denied Johnson's applications initially and on reconsideration, and an administrative hearing was held on May 3, 2021. (*Id*. at 44-75). Johnson was present and represented by counsel.

---

[1] Plaintiff had previously filed an application for disability and was determined not to be disabled by a decision dated April 25, 2018, that was affirmed by this Court in January 2020. (ECF No. 9, pp. 25, 79-91, 98-100, 104).

On her alleged onset date, Johnson was 49 years old and possessed a high school education and two years of college credit. (ECF No. 9, pp. 31, 279). She had past relevant work ("PRW") experience in a composite job of administrative clerk and resident apartment manager. (*Id*. at 36, 279, 285-292, 339).

On October 7, 2021, Administrative Law Judge ("ALJ"), Edward Starr, issued an unfavorable decision, identifying December 31, 2019, as Johnson's date last insured. (ECF No. 9, pp. 28). He found her DDD, peripheral neuropathy, obesity, migraine headaches, symptoms of bilateral carpal tunnel syndrome ("CTS") status post bilateral release surgery, anxiety, and depression to be severe impairments. (*Id*.). The ALJ concluded that Johnson did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.). Despite her impairments, the ALJ determined that Johnson retained the residual functional capacity ("RFC") to perform light work, with frequent handling and fingering bilaterally; occasional climbing, balancing, crawling, kneeling, stooping, crouching, and interaction with co-workers and the public; and no exposure to hazards such as moving machinery, unprotected heights, ropes, ladders, or scaffolds. (*Id*. at 30). The ALJ also concluded that Johnson would be limited to simple, routine, and repetitive tasks involving supervision that was simple, direct, and concrete. (*Id*.). With the assistance of a vocational expert ("VE"), the ALJ ultimately decided there were jobs that exist in significant numbers in the national economy that Johnson could perform, including housekeeping cleaner, office helper, and warehouse checker. (*Id*. at 37).

On July 13, 2022, the Appeals Council denied Plaintiff's request for review (ECF No. 9, pp. 6-11), and Johnson subsequently filed her Complaint to initiate this action. (ECF No. 2). Both

parties have filed appeal briefs (ECF Nos. 11, 12), and the matter is ripe for resolution. The case has been referred to the undersigned for Report and Recommendation.

## II. Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record to support the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A claimant must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The fact finder will consider Plaintiff's age, education, and work experience in the light of her residual functional capacity only if the final stage of the analysis is reached. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III. Discussion

Johnson raises several issues on appeal, including: (1) whether the ALJ properly assessed the medical opinions of record; (2) whether the ALJ's RFC determination was proper; (3) whether Johnson's subjective complaints were properly considered; and (4), whether Johnson can perform the jobs identified by the ALJ. After a thorough review of the record, the undersigned agrees that remand is necessary to allow the ALJ to reconsider the medical opinions of record and Johnson's RFC. Of particular concern to the undersigned is Johnson's ability to stand and walk, manipulate objects, and handle the mental demands of full-time work.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545, 416.945. A disability claimant has the burden of establishing her RFC. *Vossen*, 612 F. 3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010);

*Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a claimant's RFC is a medical question. *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 CFR §§ 404.1527(c)(2), 416.927(c)(2); s*ee also Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). If a treating physician's opinion is not given controlling weight, then the ALJ must review several factors in determining the weight to be given, including the length of the treatment relationship, the frequency of said treatment, the type of treatment provided, the supportability of the provider's opinion, the consistency of said opinion with the overall record, and any specialty certifications held by the provider. 20 CFR §§ 404.1527(c)(2), 416.927(c)(2). Opinions of non-examining sources, however, are generally entitled to less weight. *See Papesh*, 786 F.3d at 1133.

A.   **Physical Impairments**

Johnson insists that the ALJ failed to assign the proper weight to the assessments of the various treating and examining physicians, and to include all her physical impairments in the RFC. The transcript contains records documenting a lengthy history of neuropathy, back pain, knee pain, and bilateral CTS. On January 29, 2017, Johnson presented to Dr. Margaret Cox at Mercy Clinic

with complaints of fatigue, muscle weakness, numbness/tingling, and arthralgia. (ECF No. 9, pp. 424-427). Dr. Cox assessed her with stable neuropathy on Lyrica.

In March 2017, she complained of intermittent wrist swelling, sleep disturbance, pain in multiple joints, myalgia, a dysphoric mood, nervousness, and anxiousness. (ECF No. 9, pp. 427-429). Dr. Cox refilled her Lyrica prescription and prescribed cock-up splints for her CTS.

Three months later, Johnson complained of a drawing of the thumb and little finger on her left hand. (ECF No. 9, pp. 430-432). And an exam revealed cervical and lumbar tenderness with a decreased range of motion. Dr. Cox continued the Lyrica.

On August 14, 2017, although she continued to experience numbness, it was now intermittent and localized to her legs and hands. (ECF No. 9, pp. 433-434). Johnson also reported fatigue, arthralgia, back pain, gait problems, neck pain and stiffness, and weakness. Dr. Cox ordered nerve conduction studies ("NCS"), but she also opined that Johnson's anxiety, depression, and stress likely contributed to her symptoms.

On February 7, 2018, the numbness and tingling in her arms and legs and right knee pain persisted. (ECF No. 9, pp. 436-439). She exhibited a decreased range of motion in her right knee, and Dr. Cox recommended compression, rest, elevation, and icing, referred her to podiatry, and continued the Lyrica.

Plaintiff visited Arkansas Orthopedics and Sports Medicine ("AOSM") on February 9, 2018, and conferred with orthopedist, Dr. Brian Linn, for complaints of right knee pain, crepitus, locking, and instability. (ECF No. 9, pp. 636-637). In early January, she had slipped, fallen, and twisted her right knee. She could not fully flex or extend it and had 1+ effusion, severe tenderness in the medial joint line, and a strongly positive McMurray's test. X-rays were normal, although she exhibited a lateral tracking patella. Dr. Linn ordered an MRI.

Johnson returned to AOSM with an unchanged exam on February 15, 2018. (ECF No. 9, pp. 637-638). An MRI showed a tear of the posterior horn of the medial meniscus in the right knee. Dr. Tarik Sidani recommended an arthroscopic partial medial meniscectomy of the right knee, which he performed on February 27, 2018. (*Id*. at 640-641). Post-operatively, however, she continued to have a limited range of motion and stiffness in the knee. (*Id*. at 637-638).

Nerve conduction studies on April 3, 2018, showed bilateral upper extremity sensory neuropathy, bilateral CTS, and right tibial mononeuropathy. (ECF No. 9, pp. 460-466). Dr. William Knubley ordered bilateral wrist braces and referred her to a surgeon.

On April 16, 2018, Dr. Sidani treated Johnson for continued complaints of numbness and burning in both hands. (ECF No. 9, p. 641). She had a positive Tinel's sign and numbness after 10 seconds with Durkan's compression test. He recommended right CT release, which he performed on April 27, 2018. (*Id*. at 642-643).

In May 2018, Johnson was doing "pretty well," but she had some residual numbness and tingling in her right thumb and index finger after falling and landing on her hand three days earlier. (ECF No. 9, p. 644). She also reported CTS symptoms in her left upper extremity. Noting no significant abnormalities on exam, Dr. Linn advised her to return to his office when she was ready to schedule surgery on her left wrist.

On June 4, 2018, the crepitus in her right knee and pain in her right wrist remained. (ECF No. 9, pp. 440-444). Dr. Cox recommended that she follow up with her surgeons for hand and knee pain. And, two days later, Dr. Linn advised her to work on desensitizing her hand and gave her exercises for her knee. (*Id*. at 644, 647).

On February 14, 2019, Johnson reported back, arm, and leg pain with burning pain in her feet. (ECF No. 9, pp. 445-447). She felt like she was walking on rocks and experienced neck pain

radiating into her arms. On exam, Johnson exhibited a diminished range of motion in her cervical spine with tenderness and numbness on the bottoms of her feet. Dr. Cox diagnosed idiopathic peripheral neuropathy, spondylosis of the cervical region, and chronic bilateral lower back pain without sciatica. She prescribed Lyrica and Mirapex for her restless leg symptoms, and an MRI of her cervical spine was ordered. The MRI ultimately showed multilevel DDD; diffuse marginal spondylosis at the C5-6 level with protrusion and bony ridging with partial effacement of the cerebrospinal fluid ventral to the cord and mild bilateral foraminal stenosis; mild disc protrusion at the C6-7 level; and degenerative facet arthropathy at the C7-T1 level. (*Id*. at 550-551, 555, 559, 564, 568, 645-646).

Johnson returned to AOSM on March 4, 2019, with complaints of worsening CTS on the left side and cervical radiculopathy. (ECF No. 9, p. 647). She had positive Tinel's and Durkan's compression tests on the left, as well as a positive Spurling's maneuver. Certified Nurse Practitioner ("CNP"), James Hankins, diagnosed CTS on the left and cervical radiculopathy, for which he prescribed CT release, a Medrol Dosepack and Mobic. Dr. Tarik Sidani performed the left CT release surgery on March 29, 2019. (*Id*. at 648-649). Post-operatively, however, Johnson continued to experience some numbness, neck pain, tenderness in her cervical spine and periscapular muscles, and a positive Spurling's maneuver. (*Id*. at 635). Dr. Sidani recommended an exercise program for her hand and wrist, and he referred her to a neurosurgeon for her cervical radiculopathy with herniated disc at the C5-6 level.

She saw Dr. Linn again on November 5, 2019, for complaints of right knee pain and instability after falling in her yard approximately four weeks earlier. (ECF No. 9, p. 634). She had used ice and Aleve to no avail. An exam revealed swelling, tenderness, and a slightly positive McMurray's sign. After diagnosing right knee pain and contusion, Dr. Linn recommended a knee

brace, home exercises, and icing and prescribed Meloxicam. He advised that an MRI would be ordered if her symptoms persisted.

On December 10, 2019, Johnson was having a lot of neck pain, bilateral arm numbness, and fatigue. (ECF No. 9, pp. 453-455, 517-520). An exam revealed a decreased range of motion and tenderness in her cervical spine. Dr. Cox prescribed Gabapentin.

On June 9, 2020, Johnson was experiencing increased neuropathy, restless legs, fatigue, joint pain, and leg pain. (ECF No. 9, pp. 456-460, 521-539). She felt the Gabapentin was somewhat helpful.

Eight days later, Dr. Jonathan Norcross, a non-examining physician consultant, reviewed the record and provided an assessment of Johnson's physical abilities. (ECF No. 9, pp. 115-116). He opined that she could lift/carry 10 pounds frequently and 20 pounds occasionally, and sit, stand, and walk about six hours per day. On November 5, 2020, Dr. Jim Takach agreed she could perform light work, but he limited her to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (*Id*. at 150-152).

Johnson saw Nurse Hankins at AOSM on December 10, 2020, for worsening bilateral heel pain that made walking very difficult. (ECF No. 9, p. 633). She had exquisite tenderness over the plantar fascia insertion, worse on the right. Believing this to be bilateral plantar fasciitis, he injected both heels and recommended shoe inserts, physical therapy, ice two to three times per day, and a home exercise program.

On April 1, 2021, she returned to Dr. Sidani after falling on the ice and injuring her knee approximately six weeks earlier. (ECF No. 9, pp. 631-632). He noted that she had pain with passive range of motion in her right knee, a sharp McMurray's sign with audible popping, and

medial joint line tenderness. She had taken anti-inflammatories with little relief. An MRI showed a tear in the posterior horn of the medial meniscus, so he scheduled her for arthroscopic surgery.

CNP Peggy Rosson performed a consultative physical examination on July 31, 2021. (ECF No. 9, pp. 719-726). An exam revealed tenderness in the cervical paraspinal muscles; the inability to tolerate straight leg raising due to pain; 4/5 grip strength bilaterally; an inability to tandem walk, walk on heels, walk on toes, and squat and rise due to instability and poor balance; an ataxic/unsteady gait; a limited range of motion in her cervical spine; and limited flexion and abduction in the right shoulder. After diagnosing PTSD, major depressive disorder, DDD of the cervical spine and lumbar spine, chronic neck, back and extremity pain, migraines, arthritis, and anxiety, Nurse Rosson indicated that Johnson must: change positions frequently due to back pain; stop to rest after walking approximately 30-40 feet due to back pain; and could lift/carry approximately five pounds occasionally but may drop things due to a weak grip and CTS.

After carefully reviewing this evidence, the undersigned does not find substantial evidence to support the ALJ's treatment of the medical source evidence or his RFC determination. As Johnson has pointed out, examinations conducted by both treating and consulting physicians suggest that her physical restrictions exceed the light work with frequent fingering and handling and occasional posturals in the RFC assessed by the ALJ. Treatment records from Johnson's physicians documenting an extensive history of DDD, CTS, neuropathy, and knee issues, as well as objective findings revealing pain and tenderness, positive straight leg raise tests, an abnormal gait, decreased grip strength, range of motion deficits, bulging disks, crepitus in the knee, and positive Spurling's test make it clear that Johnson would have difficulty standing and walking for six hours per day and frequently handling and fingering. Accordingly, this matter will be

remanded to the ALJ for further consideration of both the medical source evidence and the Plaintiff's physical RFC.

### B. Mental Impairments

Johnson also contends that the ALJ failed to properly consider the mental evaluations in evidence and to include all her mental impairments in the RFC determination. Records dating back to at least 2017 document Johnson's treatment for mental impairments to include PTSD, stemming from the trauma she suffered while volunteering after the Joplin, Missouri tornado in 2011, and depression. Advanced Practical Registered Nurse ("APRN"), Kellie Berry-Hert, at Valley Behavior Health ("VBH") prescribed Remeron, Effexor XR, Hydroxyzine, and Valium and recommended both individual therapy and medication management. (ECF No. 9, p. 367).

Notes from VBH on March 27, 2017, indicate Johnson had become more irritable due to moving in with her parents and was frequently lashing out at them in anger. (ECF No. 9, p. 365). On stormy days, she was also increasingly anxious, requiring up to three Valium per day. As such, Nurse Berry-Hert increased Johnson's Valium dosage.

On July 7, 2017, her panic attacks had slightly reduced in frequency, but weather continued to be a significant trigger. (ECF No. 9, pp. 368-371). She had moderate to severe depression, anxiety/panic, and trauma symptoms. Nurse Berry-Hert diagnosed major depressive disorder and PTSD. Four days later, Nurse Berry-Hert Hert prescribed Remeron, Effexor XR, Hydroxyzine, and Valium and strongly encouraged her to use her CPAP (as she felt her sleep apnea contributed to her inflammation). (*Id*. at 363).

Licensed Professional Counselor ("LPC") Susan Smith at The Guidance Center completed a comprehensive assessment of Johnson on February 5, 2018. (ECF No. 9, pp. 405-410). At that time, Johnson reported persistent flashbacks and nightmares, and the sound of emergency sirens

sent her into a panic. LPC Smith diagnosed PTSD and major depressive disorder, and she recommended continued medication and therapy.

On May 12, 2018, Nurse Berry-Hert conducted a psychological diagnostic assessment. (ECF No. 9, pp. 401-404). Johnson remained hypervigilant about the weather, avoided large groups of people because it reminded her of her trauma, and she experienced severe anxiety that oftentimes affected her ability to walk. Her mood was irritable, and her affect was dysphoric. Nurse Berry-Hert prescribed Mirtazapine (Remeron) and reduced her dosage of Venlafaxine ER (Effexor) due to reports of excessive sweating and vivid nightmares.

On February 18, 2019, Nurse Berry-Hert noted that Johnson was socializing with friends but remained very anxious in public. (ECF No. 9, pp. 397-400). She decreased her dose of Effexor and added Hydroxyzine as needed for anxiety.

In September and December 2019, Johnson remained depressed and anxious. (ECF No. 9, pp. 712-717). And she continued to struggle with physical health related stressors.

In early 2020, Johnson discussed feelings of loss and low self-esteem related to her physical health and inability to work. Her PTSD and depression significantly impacted her ability to function and maintain independence, and her depression interfered with her daily functioning. (ECF No. 9, pp. 394-396, 702-711). She had become "fed up" with her medications because they made her feel "doped up" and caused her to gain weight. Her nightmares and anxiety persisted, with heightened anxiety in anticipation of storm season. Nurse Berry-Hert prescribed Trazodone for sleep. (*Id*. at 396).

During a therapy appointment in March 2020, Johnson was very upset and flooded with emotions after experiencing flashbacks and nightmares of childhood sexual abuse at the hands of a neighbor. (ECF No. 9, pp. 700-701). She was depressed and anxious with a constricted affect.

Her symptoms escalated further in April and May 2020 due to the COVID pandemic and bad weather. (*Id*. 692-699). She was slipping into isolation and LPC Smith noted very little progress toward her treatment goals.

On June 10, 2020, LPC Smith documented a depressed/anxious mood and full and appropriate affect. (ECF No. 9, pp. 690-691). Because Johnson reported never fully feeling relaxed, LPC Smith recommended meditation, basic yoga stretches, and noise cancelling headphones.

15 days later, her mood remained depressed and anxious, and her affect blunted. (ECF No. 9, pp. 688-689). She panicked when she heard emergency sirens and was unable to find any happiness or joy in life. And, in July, LPC Smith noted very limited progress toward her treatment objectives. (*Id*. at 683-684).

Dr. Margaret Podkova, a non-examining physician consultant, reviewed the record on July 16, 2020, and concluded there was insufficient evidence to rate Johnson's mental impairments. (ECF No. 9, pp. 114-115, 123-125).

On July 20, 2020, Johnson had grown increasingly anxious and agitated due to the pandemic and was not sleeping well. (ECF No. 9, pp. 685-687). Her mood was anxious with a reduced affect. Nurse Berry-Hert increased her dosage of Trazodone. Treatment notes dated between July and October 2020 document continued problems with depression, anxiety, frustration, and sleep disturbance. (*Id*. at 673-682). Again, LPC Smith noted very little progress toward her goals.

On October 15, 2020, Dr. Samuel Hester performed a consultative psychological evaluation. (ECF No. 9, pp. 618-626). Johnson had a 20-year history of treatment for mental impairments, to include both inpatient treatment for suicidal intent and outpatient maintenance

with current prescriptions for Trazodone, Melatonin, and Gabapentin. On exam, she was cooperative with an anxious mood, appropriate affect, normal speech, and logical thought processes. There was no evidence of hallucinations or delusions, and she denied current suicidal or homicidal ideation. Dr. Hester diagnosed depressive disorder, not otherwise specified, by history; PTSD, by history; panic disorder without agoraphobia; pain disorder; migraine; DDD; and CTS. He concluded she maintained the ability to communicate and interact in a socially adequate manner, although she was somewhat avoidant, and she sustained persistence in completing tasks. She had a limited ability, however, to attend to and sustain concentration on basic tasks; might not be able to cope with the mental demands of basic work tasks until she made more progress in treatment; and she might not be able to complete work tasks within an acceptable timeframe due to pain issues.

Dr. Jon Etienne Mourot, another non-examining physician consultant, conducted an independent review of the record on November 5, 2020. (ECF No. 9, pp. 146-148). He concluded that Johnson could perform work where the interpersonal contact was routine but superficial; the complexity of task was learned by experience with several variables; the judgment required was within limits; and where the supervision available was little for routine but detailed for non-routine tasks.

Between November and December 2020, Johnson's physical impairments continued to cause depression and anxiety. (ECF No. 9, pp. 669-672). She felt overwhelmed, and LPC Smith again noted very limited treatment progress.

In February 2021, with her physical health continuing to decline, Johnson became more depressed. (ECF No. 9, pp. 666-667). Her affect was labile, and she was extremely frustrated

because she did not feel she was receiving the treatment she needed. She was, however, fully oriented, with rational with intact judgment and insight.

Johnson had a medication management appointment with Nurse Berry-Hert in mid-March 2021, at which time she reported sleep disturbance and heightened anxiety, as it was once again storm season. (ECF No. 9, pp. 663-665). An exam revealed an anxious mood and fair insight. Due to prior medication side effects, however, Johnson was very hesitant to try other selective serotonin reuptake inhibitors ("SSRI") or an anxiolytic, such as Buspar. Noting her current medications to be partially effective with no side effects, Nurse Berry-Hert prescribed Hydroxyzine to be used as needed for breakthrough anxiety.

Therapy appointments in March and April 2021 document continued deterioration of her physical health and the health of her mother. (ECF No. 9, pp. 659-662). She feared she would never improve. LPC Smith indicated she was losing treatment gains due to these ongoing stressors in her life.

On April 23, 2021, LPC Smith completed an assessment of Johnson's mental functioning. (ECF No. 9, pp. 654-658). She assessed Johnson with extreme limitations in the following areas: ability to demonstrate reliability and maintain regular attendance; be punctual within customary tolerances; understand and remember detailed or complex instructions; maintain attention and concentration for extended periods of time; perform within a schedule; complete a normal workday; and travel in unfamiliar places or use public transport. Further, LPC Smith opined that Johnson would have severe restrictions in the following mental areas: ability to interact with the general public; deal with work stresses; set realistic goals and/or make plans independently of others; respond appropriately to changes in work procedures; respond and adjust to the use of new and unfamiliar tools and/or machinery; adjust to the introduction of new and unfamiliar personnel;

perform at a consistent pace; behave in an emotionally stable manner; accept instructions and respond appropriately to criticism from supervisors; or work in coordination or proximity to others without being distracted. And, finally, she found marked impairment in the following areas: ability to relate to coworkers; interact with supervisors; make simple work-related decisions; remember work-like procedures; understand and remember simple instructions; carry out detailed or complex instructions; sustain an ordinary routine without special supervision; avoid undue constriction of interests; respond appropriately to changes in routine work setting; be aware of normal hazards and take appropriate precautions; ask simple questions and request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. LPC Smith indicated that these restrictions resulted from Johnson's diagnoses of PTSD and major depressive disorder and have existed continuously for more than one year prior to the date of her assessment.

On November 10, 2021, Nurse Berry-Hert assessed Johnson's work-related functioning. (ECF No. 9, pp. 17-21). She concluded that Johnson was severely limited in her ability to relate to coworkers, interact with supervisors, interact with the general public, demonstrate reliability, understand and remember detailed or complex instructions, carry out detailed or complex instructions, maintain attention and concentration for extended periods of time, maintain a consistent pace at a satisfactory speed, perform at a consistent pace without an unreasonable number or length of rest periods, perform within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, respond appropriately to changes in the work setting or procedures, be aware of normal hazards and take appropriate precautions, behave in an emotionally stable manner, get along with or work

in proximity to others without be distracted by them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Dr. Berry-Hert also noted extreme limitations in several work functions, including her ability deal with work stressors, complete a normal workday, adjust to unfamiliar personnel and tools and/or machines, travel in unfamiliar places or use of public transport, avoid undue constriction of interests, accept instructions, respond appropriately to criticism from supervisors, and perform in a densely populated environment. She identified somnolence as a side effect of Johnson's medications and indicated that her symptoms had remained substantially the same for five years or more.

As noted above, both Johnson's treating counselor and nurse practitioner assessed additional restrictions that are not included in the ALJ's RFC determination. The ALJ failed to assign substantial weight to these opinions, finding that they were neither supported by the treatment records of the medical providers nor the overall record. The records from these providers, however, document ongoing issues with PTSD and depression/anxiety that impact her ability to respond appropriately in a work environment. For example, she was obsessed with her physical health and the health of her parents, terrified of the Spring storm season and experienced extreme anxiety during storms, panicked when she heard emergency sirens, avoided crowds, tended to self-isolate, and was consistently frustrated and prone to lash out in anger at those around her. Johnson also experienced flashbacks of both her childhood sexual abuse and her relief work after the Joplin tornado. These limitations, however, are not included in the ALJ's RFC assessment. Accordingly, we also find remand necessary to allow the ALJ to reconsider the mental assessments of record and Johnson's mental RFC.

## IV. Conclusion

Based on the foregoing, I recommend reversing and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 31st day of May 2023.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE